## Case No. 10,221.

### The NIAGARA.

[16 Blatchf. 516; 16 Alb. Law J. 156.] [1]

Circuit Court, S. D. New York.    July 31, 1879.

SHIPPING—STOWAGE—COMMINGLING OF SALT AND
ARSENIC—DAMAGES.

A vessel carrying fine table salt in sacks, with powdered arsenic in casks. stowed the arsenic so negligently that, during the voyage, by severe weather, the casks of arsenic were broken. so that the arsenic escaped, and was distributed on some of the sacks and in the vessel.  The vessel, without notifying the consignees of the salt of what had occurred, and without separating the sacks with which the arsenic had come in contact from the other sacks, allowed the sacks to be indiscriminately discharged, so that it was impossible to make such separation afterward.  On examination of a sack it was found that the arsenic had penetrated the sack covering and impregnated the salt.  Nothing but an analysis of each sack could have determined whether the salt in it was fit for consumption. The commercial value of the salt was destroyed and it was sold for fertilizing purposes: *Held*, that the vessel was liable for the difference between the commercial value of the salt, as sound salt, when it was discharged, and what it sold for for fertilizing purposes.

[Appeal from the district court of the United States for the Southern district of New York.]

This was a libel in rem, filed in the district court, in admiralty.  That court decreed for the libellant [case unreported], and the claimants appealed to this court.  The decision of the district court (BLATCHFORD, District Judge) was as follows: "The libellant in this case, Charles A. McDowell, in March, 1875, shipped on board of the ship Niagara, at Liverpool, to be carried to New York, 1,950 sacks of fine table salt, called Ashton salt, under bills of lading in the usual form, which recited that the sacks were received by the ship in good order, and were to be delivered in like good order.  The libel alleges that the ship carried, on the same voyage, about 100 kegs of powdered arsenic. which were stowed on the main deck immediately abaft, and near to, the main hatch; that a portion of the salt was stowed in the lower hold abaft the main hatch, and another portion on the main deck abaft the main hatch, and the residue in the between decks abaft the main hatch; that the kegs of arsenic were stowed on the main deck immediately between the salt on that deck and the main hatch, and in such position, that, in case the arsenic, or any part of it, should break loose, or become scattered, during the voyage, it would be in a situation to come in contact, and become mixed, with the salt on the same deck, and with that in the hold below the place of stowage of the arsenic; that the Niagara is a large vessel, having two decks below the spar deck; that, during the voyage, the main hatch below the spar deck, remained uncovered;    that the

planks of the two lower decks were in such loose condition as to permit the arsenic, if it were to break loose, to sift through the cracks of said decks and become mixed with the salt stowed in the hold; that. during the voyage, the kegs of arsenic. or a large part of them, either through defect of stowage, or for some other cause, became loose and were broken to pieces, and the arsenic spread over and sifted through the said decks, and down the main hatch, and became scattered throughout those portions of the vessel in which the salt was stowed, to such extent as to render the same, or a great part thereof, poisonous and utterly unsafe and unfit for use, and valueless, or nearly so, and so that it became entirely unsafe to use any part of it for the purposes for which it was intended. or for any other ordinary purpose, or to permit it to be sold or disposed of in market. and the damage to the salt amounted substantially to a total loss of the whole; that the disaster ought to have been guarded against, and would have been prevented by proper care and precaution on the part of the owners and master of the ship, but they failed to exercise such care and precaution; that, by reason of the dangerous condition of the salt, the consignees thereof were not able to dispose of it in the ordinary course of their dealings, but have been obliged to transport and stow it in places of security, to prevent the possibility of its being used as an article of food, and the libellant has thereby incurred expenses of lighterage, labor and storage to a large amount; and that such damage, loss and charges have been occasioned by the improper receipt and stowage of the arsenic, and by the wrongful acts, defaults and want of due care and caution of the owners and master of the ship.  The answer avers, that the kegs of arsenic were stowed on the between decks and not on the main deck; that a portion of the salt was stowed on the between decks, abaft the second stanchion aft of the chain locker, and the piles or tiers thereof ran back on the between decks to about midway between the last stanchion and the forward combings of the after hatch; that a portion of the salt was stowed in the lower hold, extending from the stanchion in front of the main-mast back to the tank or chain locker, and thence aft, and the remainder of the salt was stowed on the orlop deck, (an extra deck between the lower hold and the between decks;) that all the salt was stowed abaft the main hatch; that the sacks of salt on the between decks did not reach within 32 feet of the arsenic, and the rows or tiers of salt on the between decks, nearest the arsenic, were fully protected by matting, so as to render it impossible for the arsenic, under any circumstances, to come in contact with the salt on the between decks; that none of the salt stowed in the lower hold was stowed immediately under the arsenic stowed on the between decks; that, in case the arsenic, or any part of it, should have broken

---

[1] [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission. 16 Alb. Law J. 156, contains only a partial report.]

loose on the voyage, it would not be in a situation to come in contact with the salt in the lower hold, except so far as small portions of the arsenic might sift through the floor of the between decks; that none of the salt stowed on the orlop deck could come in contact with the arsenic, if scattered from the kegs in which it was contained; that no part of the salt in the lower hold was directly under the main hatch for at least 12 feet, such space being stowed with hogsheads of soda ash and dirt ballast; that there was an aperture around the main-mast, where it passed through the between decks, of small dimensions, where the mast wedges worked during the heavy weather encountered on the voyage, and also two small cracks, one on the port and the other on the starboard side of the between decks, in the space on the floor of the between decks abaft the main hatch, through which, if the arsenic were to break loose, small portions of it might be sifted and fall down on the top tier of the sacks of salt immediately contiguous to said aperture or cracks; that 30 or 40 of the kegs of arsenic became loose, during the voyage, and were broken to pieces, not through defect of stowage, but solely on account of extreme stress of weather; that the only arsenic that sifted through the decks was such as escaped through said aperture around the main-mast, and through the said two small cracks on either side of the between decks, and that the same did not cover more than a comparatively small number of the sacks of salt which were in the lower hold immediately under the main-mast, and the ends of the tiers thereof on the port and starboard sides of the lower hold; that, as to those sacks on which the arsenic fell, the salt was not thereby rendered poisonous and unsafe and unfit for use, nor was it incapable of being sold in market; that all proper care and precaution were taken on the part of the owners and master of the ship, to prevent the alleged disaster; and that at least 1,350 bags of the salt were wholly free from arsenic. On the same voyage, there were shipped by the same vessel, under like bills of lading, by one Bowen, consigned to St. John & Avery 2,850 sacks of fine table salt, called Marshall salt. The consignor and consignees file a libel against the vessel, to recover for a total loss of that salt. The libel in that case makes, in substance, the same averments as the libel filed by McDowell, except that it alleges that the 2,850 sacks were stowed partly in the lower hold abaft the main hatch, and another portion in the between decks below the main deck, and probably a small portion on the main deck, all of it abaft of the main hatch. The answer to the last named libel makes, in substance, the same averments as the answer to the libel filed by McDowell, and alleges that at least 1,950 bags of the Marshall salt were wholly free from arsenic. The salt in question was intended solely for table or other domestic use, and was of the finest quality,

and commanded a high price in the market. It was stowed in the lower hold, and on the between decks, and on an intermediate deck called the orlop deck, and, in each case, abaft the main hatch. On the between decks, and abaft the main hatch, but forward of the salt on the between decks, were stowed 99 casks of white powdered arsenic, each cask being about 20 inches long and containing about 300 pounds. These casks were in three rows across the ship, the heads fore and aft, each cask against the deck below, nothing on top of them, the forward row up against the after combing of the main hatch so far as such combing extended across the deck, but, outside of such combing on each side, nothing to stay the casks, nothing to stay the after row aft, the forward end of the second row against the after end of the first row, and the forward end of the third row against the after end of the second row, the casks being chocked by pieces of wood sidewise and at the end of the rows. The arsenic occupied a space of 5 feet fore and aft directly aft from the main hatch. The nearest salt to the arsenic on the between decks was 30 feet aft of the arsenic. Those bags of salt were piled up all across the between decks, but there was a space of about three feet between the top of them and the deck roof above, and the bags next to the arsenic were covered from the deck floor to the top of the pile, all across, with pieces of matting, which lapped over the top of the pile. The main-mast came up through the between decks in the 30-feet space between the arsenic and the salt. That space was empty. In the lower hold the salt was piled to within about 3 feet of the deck roof above, on both the starboard side and the port side, directly underneath said 30 feet of empty space, the bags of salt on the starboard side projecting a little forward of the main-mast, and those on the port side projecting as far forward as the after part of the main-mast. The after part of the main-mast was 16 feet aft of the after combing of the main hatch. The openings of the main hatch from the between decks to the lower hold were not covered during the voyage. The kegs of arsenic broke loose during the voyage, a large number of them had their heads broken away, and the contents of those were discharged and scattered all about, in the free area which was open in the between decks and in the opening of the main hatch. This tossing about of the loose arsenic continued for a considerable time before any of it could be secured and put into the casks again, with new heads. The weather was stormy, and, when the casks had been put in place again, after a fashion, the same breaking loose of casks and staving of the heads of casks occurred a second time, and there was the same tossing about of loose arsenic. After all, there was a pile of loose arsenic in the between decks, which remained there during the voyage. The first time the kegs broke loose, 30 or 40

of them had their heads broken, and the loose arsenic and the unbroken kegs seem to have remained free, for 9 days, to follow the motions of the vessel, before anything was done to secure either the loose arsenic or the kegs. The evidence shows that the loose arsenic reached a good many of the bags, and that, in some, it penetrated through the bagging and mingled with the salt. To what extent any bag with which the loose arsenic had come in contact was impregnated by it could not be told, with any safe reliance, except by analysis. The salt and the arsenic were alike white and undistinguishable to the eye. Two bags of the salt were analysed. In one, arsenic was found, to such an extent that there might have been as much as 3½ grains of arsenic in a pound of salt, less than one grain of arsenic having destroyed human life. In the other bag, arsenic was found in salt taken carefully from the centre of the bag, by digging down. Knowing that the arsenic had so broken loose, the master and officers of the ship not only did not, before breaking out the sacks of salt, or discharging any of them, inform the consignees of the salt of the facts, with a view of separating the sacks on the outside of which the presence of loose arsenic could be detected from those which were clean, nor did they take any steps to make such separation, but they discharged indiscriminately sacks which were clean and sacks which had arsenic on them. There can be no doubt that there were, as the sacks lay in the vessel, after her arrival, before the discharging of the sacks commenced. some sacks which were clean, untouched by arsenic. How many there were can never now be ascertained. Then it was easy to make the separation, because the arsenic was visible to the eye on the outside of the bag. But, indiscriminate discharging, and the putting of bags with arsenic on them in contact with clean bags, during transportation on lighters and other handling, would not only diffuse the loose arsenic more widely, and contaminate and impregnate bags before clean, but make it doubtful, in many cases, how far bags before clean remained wholly safe. For whatever difficulty thus resulted the ship is responsible. The delivery of the salt commenced on the 16th of April. On that day 775 sacks of the Marshall salt were delivered from the after hatch to a lighter. On the 17th, which was Saturday, 500 sacks of the Marshall salt were delivered from the after hatch to another lighter. On the same day, 200 sacks of the Marshall salt were delivered from the after hatch to the lighter Zouave, and 300 other sacks of the same salt were delivered to the same lighter from the main hatch, some from the lower hold and some from the between decks. On quite a number of those from the lower hold a white powder was noticed by the delivery clerk, and the captain of the lighter refused to receive those as in good order. The fact was mentioned to McFarlane, the master of

the ship, and the mate, who must have known what the white powder was, said, on the 17th, in the hearing of the delivery clerk, that he would brush off the white powder, if it was found on any more bags. Yet the delivery clerk did not know until the 19th that the white powder was arsenic, and went on delivering 430 sacks of Ashton salt on the 19th, until he was, on that day, directed to stop delivering. No more were delivered till the 22d. On the 19th, and not till then, the master of the ship informed the consignees of the ship of the breaking loose of the arsenic, and of the delivery of some of the salt, and that he desired the consignees of the salt to be notified that some of the arsenic might have got on to the salt. Thereupon, the master, with Mr. Smith, the representative of the ship, called on the consignees of the Ashton salt, and notified them that there had been arsenic on the ship, and that a large portion of it had got loose. The Ashton salt had been sold to arrive and was being delivered to the purchaser. The consignees of the salt told the master and Mr. Smith to stop discharging, and then took legal advice, and then notified the purchaser to prevent the use of any of the salt. The action of those in charge of the ship had made it impossible to tell, without chemical analysis, which of the sacks already delivered were affected by arsenic and which were not. Such analysis would have cost more than the value of the salt. The consignees of the Ashton salt at once employed a chemist, Professor Doremus, who went to the ship on the 21st, and inspected the between decks and the lower hold, and the remaining sacks of salt and the kegs of arsenic and the loose arsenic, and took various samples for analysis. At that time 2,205 bags. out of 4,800, had been delivered. The result of the examination and analysis by Professor Doremus was, that he advised the consignees of the salt, that all the salt which came on the ship ought to be used solely for purposes where human life would not be endangered. After that the rest of the salt was discharged and stored separately, and every bag that had been before discharged was put with it. The whole remained for a year and was then sold for manure, under an arrangement between the parties. It satisfactorily appears, from the analyses of the specimens and articles from different parts of the vessel, made by Professor Doremus and Mr. Waller, another chemist. and from their testimony, that the loose arsenic had diffused itself quite extensively through the vessel. and had penetrated through some of the sacks into the salt. The sack analysed by Mr. Waller appeared to him to be clean on the outside, yet he found arsenic in it. Professor Chandler, a chemist, and president of the board of health, made. at the vessel, a like examination to that which Professor Doremus made, and caused the specimens to be taken which Mr. Waller analysed, and, on Mr. Waller's report, was of opinion that no harm could come from the use of the

salt, because no one person would consume enough of the salt to appropriate to himself arsenic enough to be hurtful. It is contended, for the claimants, that, on the evidence, there was no ground for any reasonable supposition that the salt in the between decks could have been at all impregnated with the arsenic, or that any portion of the salt in the lower hold could have been so impregnated, except what was in the lower hold directly under the space on the between decks between the after combing of the main hatch and the salt on the between decks; that the master of the vessel had no reason for supposing, when he commenced the delivery of the salt, that the arsenic had contaminated any of the bags of salt other than some in the lower hold, near the main hatch; and that, therefore, the master was guilty of no negligence in not giving notice to the consignees of the salt, of what had occurred, before delivering any of the salt. The answer to this view is, that it was the duty of those in charge of the ship to take care that such bags of the salt as were clearly and beyond question free from signs of arsenic, and so situated that arsenic could not have reached them, and uncontaminated, in fact, by arsenic, should, during discharge, and after discharge, be kept separate from the other bags. No reasonable man on the ship could, after what had occurred, expect that there were not some bags which the loose arsenic had reached. Perhaps the separation referred to might have been effected by the officers of the ship, without notifying the consignees of the salt, by some such method as taking all the salt out of the vessel, and separating it as it came out, and not parting with the custody of any of it till all of it was taken out and separated. But, it was hardly possible that notice of the presence of arsenic on the bags should fail to reach the consignees of the salt, when bags with arsenic on them should be delivered to them; and it was the dictate of plain prudence and ordinary common sense to notify the consignees of the salt before taking any of the bags out of the vessel, in order that they might co-operate in making the proper separation, if it could be made. As it was, the neglect of the master produced the consequences which ensued, and was a gross wrong to the owners of the vessel, and the owners of the salt, and the entire community, who might very well, some of them, have actually consumed some of the salt and some of the arsenic with it, but for the prompt action of the consignees of the salt. It is also urged, for the claimants, that the libellants were not prejudiced by the want of notice before the discharge of any of the salt, because it must be assumed that they would have rejected all of the salt, on the ground that, although there were no visible traces of arsenic on the outside of some of the bags, it might have penetrated through the tissue of the bags. The answer to this

suggestion is, that the giving of the notice, followed by a careful separation of the bags, would have enabled the court to determine which of the bags were free from arsenic, or to determine that none were free, or to determine that it was impossible to say which were free, or that any were free. The claimants also contend, that the course taken by the libellants, after they received the notice from the master, was calculated to create the belief that all of the salt was contaminated by arsenic, and, therefore, unfit for consumption, and that such cause destroyed the commercial value of the salt. It is shown, that the master, at the time he notified the consignees of the Ashton salt, notified, also, the consignees of the Marshall salt, and said to the latter, that he was afraid the salt was impregnated with the arsenic, and advised them not to have it used, or anything done with it, until an examination could be made. As some of the salt had been delivered, the only way to follow and give effect to the advice of the master was to notify those persons who had the salt not to use it, and, of course, the reason why must be stated—the reason given by the master—the fear that the salt was impregnated with arsenic. Therefore, the course taken by the consignees of the salt was the course suggested by the master, who best knew what had happened on the vessel, and the master's advice was sanctioned by Mr. Smith, who represented the consignees of the ship. The expert testimony of one of the principal dealers in salt in the city of New York, and which is not contradicted, is, that, on the facts proved in this case, the whole of the salt was unmerchantable, as table salt, unless there were some means of being satisfied that there was not arsenic enough in the salt to be injurious; that an indiscriminate delivery of the salt, with arsenic on some of the bags, would destroy the commercal character of the whole of the salt; and that he would not buy the salt, to sell it again, unless he could satisfy himself that the arsenic had not come in contact with it. In view of this, I see no ground for the suggestion made against the libellants, that they negligently or wilfully allowed the damages to be unnecessarily enhanced. I should rather be inclined to say that the master of the ship negligently caused the damages to be unnecessarily enhanced. The claimants further urge, that the libellants must have known, that, if it were once bruited abroad, that arsenic, to any extent, had been discovered on the sacks of salt, rumor would magnify the injury, and the value of the salt would practically be destroyed; that the course which they took virtually proclaimed to the community that all the salt which had come, and was coming, from the vessel was poisonous and unfit for consumption; that what the libellants ought to have done, when informed by the master of the presence of arsenic on some of the sacks, was, to invite the consignees of the ship to unite with them in having an examination of the salt and of

all the circumstances of the case made by medical or chemical experts, who would have certified that all of the salt, except, perhaps, a very few sacks, might safely have been used for edible purposes, and, on such a certificate, the salt could have been sold for, at least, a better price than it brought when sold for manure; and that, on the facts of the case, the libellants cannot be allowed to urge the damage done to the commercial reputation of the salt, but can recover only such damages as they can show they have actually sustained by the incorporation of arsenic with the salt in the sacks, to such an extent as to render the salt unfit for sale. The course taken by the libellants was not only a proper one, and the only proper one, in view of the circumstances of the case, but was a course suggested by the master of the vessel. They could do nothing but recall the salt which had gone out, as those in charge of the ship had deprived them of any means of identifying the contaminated bags which were out of the ship. Why, if it were at all possible to separate contaminated bags from uncontaminated bags, in discharging the rest of the bags, that was not done by those in charge of the ship, does not appear. No evidence is given that they made such separation or attempted to make it. Whether the failure to do so arose from inability or from neglect, the result is the same. Under the circumstances of the case, it was the duty of the ship, as it had the means of doing so, to separate and set apart the bags which appeared externally to have come in contact with the arsenic, and to do that bag by bag, as each bag was broken out from the bulk. Then, a certificate of a chemical expert as to the rest of the bags might have been of some value. As it was, the ship drove the libellants to a chemical analysis of each bag or a reckless sale of all the bags, with a concealment of the facts of the case. They were not bound to take either course. Those in charge of the ship destroyed the commercial value of the salt, as table salt, by the course they pursued, and the ship must respond for the damages, on the basis of the difference between the value of the salt in the market of New York as table salt, and what it in fact brought, on its sale. Let a decree to the above effect be entered in each case, with costs, with a reference to ascertain such damages."

This court found the following facts: "The ship Niagara sailed from Liverpool for New York on the 2d of March, 1875, having on board a cargo consisting of fine table salt, soda ash and arsenic. The salt was in sacks and consisted of two lots, one branded 'Ashton,' containing 1,950 sacks, and the other branded 'Marshall,' and containing 2,850 sacks. Both lots were of superior quality and intended for edible and other domestic uses. The libellant was the owner of the Ashton brand. Both shipments were made in good order, under bills of lading in the usual form.

The Ashton lot was consigned to Samuel Thompson's Nephew & Co., in New York, who were the agents for its sale in that market, and the Marshall lot to St. John & Avery. The ship had two decks besides her main or spar deck. The first above the lower hold was known as the orlop deck, and the other, which was next below the main deck, as between decks. The salt was all stowed in tiers across the vessel, abaft the main-mast, on the two decks and in the lower hold. The different brands were not kept separate. That stowed between decks extended from a point thirty-five feet abaft the main hatch to, or a little aft of, the first stanchion forward of the after hatch. About seven hundred sacks were stowed on the orlop deck. That in the lower hold commenced at, or a little forward of, the main-mast and extended aft to the tank. On the orlop deck and between decks it was piled so that a space varying from eighteen inches to three feet was left between it and the deck beams above. In the lower hold it was piled nearer the deck beams, but still a very considerable space was left between them and the salt. The orlop deck, aft of the main hatch, did not extend as far forward as the main-mast, and the sacks beyond it were piled from the lower hold up even with those on the orlop deck. Between decks the forward end of the sacks toward the main hatch was covered with a matting reaching from the deck and lapping over the top. It was held in place on deck with loose pieces of wood. Neither the between deck nor the orlop deck were perfectly tight, but, in some places, especially in the wings, there were cracks through which fine substances would pass. The main-mast was fifteen or sixteen feet abaft the main hatch, and around this, while the ship was working, like substances could pass. The main hatch, below the main or spar deck, was open down to the lower hold, during the entire voyage. The salt was piled in tiers, one sack above another, as close as it could be. The arsenic was pulverized and white. It was only a little coarser than flour, and could not be readily distinguished from the salt when the two were mixed. It was packed in one hundred casks, weighing from three to four hundred pounds each. It was stowed between decks, in three tiers of thirty-three casks each and one cask over; each tier extending entirely across the ship. The first tier commenced at the combing of the main hatch, and the three reached about five feet aft. The casks were all laid on deck, supported by pieces of wood and chocked, but there was nothing to hold them down to place, or to keep them from working fore and aft in a sea. This was bad stowage, and was entirely insufficient to keep the casks from breaking away when the ship rolled in heavy weather. The soda ash was stowed forward of the main hatch in the lower hold and the between decks. The space between decks from the arsenic to the salt was unoccupied,

except by the chain boxes. On the 10th of March the ship was overtaken by a severe storm, which lasted six days, and caused her to roll and pitch very heavily. Soon after it commenced, the arsenic, on account of its bad stowage, broke away, and was thrown about on deck from side to side with very great violence. About forty of the casks had one or both the heads broken out, and the contents, in whole or in part, were scattered around on deck. Nothing could be done towards the re-stowage until after the storm was over, as it was unsafe to open the hatches, and dangerous to work below while the ship was pitching and tossing so heavily. The third day after the storm abated the arsenic was put back into the casks and the deck swept up. The heads of about twenty of the casks were replaced, but the others were so badly broken that this could not be done with them. The casks were then stowed between the chain box and the sides of the ship, some of them standing on end. They were blocked up as well as they could be with wood. On the 24th of March another storm came on and the arsenic again broke adrift. This time about the same number of casks were stove, and the contents scattered about the deck. The largest part, however, was found in the wings. Four of the casks were so badly broken that they could not be again used. When the gale abated, all the arsenic that the casks would hold was put back, and the remainder swept into a pile on deck, a little abaft the main-mast and between that and the side of the ship, and covered with matting kept in place by pieces of wood. Ten or twelve of the casks could not be headed up in one end. The casks were again stowed, some of them standing on end, between the chain box and the sides of the ship. There was nothing between the loose arsenic in the pile and the deck. The vessel arrived in New York, without having experienced any further heavy weather, on the 4th of April. No report whatever was then made to the consignees of the salt, of what had occurred on the voyage. The soda ash and arsenic were discharged from the forward and main hatches before any of the salt was taken out. New casks were procured to replace those that had been broken up, and the others were repaired. After this, the discharge of the salt was commenced from the after hatch. All of the Ashton salt, and a part of the Marshall, had been sold to arrive. The delivery commenced on the 16th of April, and the salt was taken first from the orlop deck and between decks, and then from the lower hold. Seven hundred and seventy-five sacks of the Marshall salt were put out on the 16th, and five hundred on the 17th, all of which came from the after hatch. On the 17th, also, a lighter came alongside for another load of the Marshall salt. About two hundred sacks, for this load, were taken out of the after hatch, and, no more of the Marshall brand being accessible from that

hatch, the main hatch was opened, and the remainder of a load of five hundred sacks taken from there. As the sacks were coming out of the main hatch, the captain of the lighter discovered on some of them a white powder and objected to receipting in good order. This powder proved to be arsenic. The mate, who was superintending the getting out of the cargo, at once reported what had been discovered, to the captain. This was Saturday afternoon, and the captain, suspecting that the powder was arsenic, went to the office of the ship's consignees, to consult with them. They had left, however, before he arrived and nothing more was done until Monday morning. The lighter finished taking on her load that night. About ten o'clock Monday morning the captain had an interview with his consignees, and, upon their advice, he went to the consignees of the salt and told them what had occurred, at the same time saying he found some of the salt had become impregnated with the arsenic. One of the consignees of the salt went at once to the ship to stop further deliveries. At that time, 1,775 sacks of the Marshall brand had been delivered and had actually gone into store. This included the two or three hundred sacks that had been taken out of the main hatch. One hundred and thirty sacks of the Ashton brand, taken out of the main hatch, had been delivered upon drays, and three hundred had been loaded on a lighter alongside. All, or nearly all, save the three hundred sacks on the lighter, had actually gone into store. No attempt was made to keep that which had arsenic upon it separate from the rest, but it was thrown together indiscriminately. After the delivery had been stopped, an expert was employed by the consignees of the salt, to make a thorough examination of the vessel and such of the cargo as remained on board. Arsenic, in the form of dust, was found pretty generally diffused throughout the ship, from the main hatch aft about twenty-five feet. It was found on projecting timbers, on the floor, in some places, on rough places in the ceiling of the ship, and in the matting. It was found on very many of the sacks, in appreciable quantities. The sacks in the wings and around the main-mast were the most affected. In some instances it stood half an inch thick on the sacks. Some of the sacks were only touched on the ends. On some it extended several inches, and on others the whole upper half was covered. The point furthest aft, where any arsenic was found, was twelve feet beyond the fifth tier of sacks, in a piece of matting used for covering, and on the sacks as far as the sixth tier. The tiers beyond the sixth had mostly been removed. It had evidently sifted through the cracks in the decks and the opening around the mast. One of the sacks was taken out and opened. Samples were taken from the outside and the middle of this package, and analyzed. In all arsenic was found in appreciable quantities. On the 23d of

April the expert reported to the consignees as follows: '70 Union Place, April 23d, 1875. Messrs. Webster & St. John—Gentlemen: The day I accompanied you (April 21st, 1875) to visit the ship Niagara, pier 47, East river, I obtained dust brushed from sacks of salt stowed near the main hatch in the lower deck of said vessel; also, from sacks in the orlop deck; also, from near the main-mast; also, a white powder from the after part of the combings of the main hatch; also, a piece of matting from around the lowest part of the main-mast; also, another piece of matting from the starboard wing of the ship in the lower hold, said matting being used to protect the bags from being soiled. On submitting these to chemical analysis I found arsenic in all of them. The matting was thoroughly impregnated with the powdered arsenic. It had sifted through every portion of it. On Thursday, the 22d inst., I received at the City College, from John Welsh, truckman of Messrs. St. John & Avery, a sack of Marshall salt, which he stated he saw taken out of the middle hatch of the Niagara by the mate of the vessel, assisted by three men, and in the presence of Mr. Collins, salesman of the before-mentioned firm. I found the sack of salt covered, in great part, with a white powder, which, on analysis, proved to be arsenic. It was so liberally distributed that the slightest touch caused its removal. I carefully cut open the sack, laid back the cut sides, and removed a portion of the salt from different parts. I dissolved the samples thus obtained in water, and, by various chemical tests, obtained arsenic from the salt, thus demonstrating that, notwithstanding the compact texture of the sack, the arsenic had sifted through. From these examinations, I am of the opinion, 1st. That arsenic, in the form of a powder, has been distributed through the holds of the ship Niagara. 2d. That the white powder on many of the sacks of salt is arsenic. 3d. That the arsenic has sifted through the tissue of such sacks, and has contaminated the salt contained therein. 4th. That, in consequence of this poisonous admixture, said salt should not be used for edible purposes, as, in the household, the salting of butter, the preservation of meat, &c., &c. 5th. That, since the arsenical powder covers the sacks to so large an extent, and is so easily removed, said sacks should not be conveyed with or stored where articles used for food may be contaminated by the fine arsenical dust necessarily discharged in ordinary handling of the sacks. 6th. That, from the fact of the discovery of arsenic on the lower part of the main-mast, and in the matting covering the same, and in the matting obtained from one of the wings of the vessel, in the lower hold, and in the dust from some of the sacks of salt there stowed, this poison has gained access to this part of the ship. 7th. That, from the discovery of arsenic in the dustings of sacks of salt near the main hatch, in the lower hold of the ship, though less in amount than found on those in the upper hold, still said sacks and their contents are not free from contamination. 8th. That, inasmuch as I have learned from one of the officers of the ship Niagara, that about three thousand sacks of salt have been removed from the vessel, in my opinion, those powdered with arsenic may have contaminated others comparatively free therefrom. Hence, without a chemical analysis of the contents of each sack, it would be impossible to predicate which are free from this poison. 9th. That many sacks of salt in the hold of the vessel on the 21st of April are probably uncontaminated, but, in my opinion, it would be wise, as a matter of precaution, not to use the said salt as a condiment, or in any articles of diet. Furthermore, I have learned from the captain of the Niagara that one hundred kegs of arsenic were stowed near the main hatch in the upper hold of said ship, and that, during two severe storms, on the passage from Liverpool, nearly the half of said kegs were broken, and their poisonous contents scattered, and, as I have found said arsenic disseminated, in a pulverulent form, in the holds of the vessel, even passing in considerable quantities between the mainmast and the deck, and through crevices in the deck to the lower holds, and as it is known that from one to five grains of arsenic may produce fatal results in the human being, from my experience as a toxicologist, I am of the opinion that all the salt imported by the ship Niagara, during her last voyage from Liverpool, should be used solely for purposes where life would not be endangered. I have the honor to remain, your obt. servt., R. Ogden Doremus.' The expert, as a witness in the cause, substantially reiterated the statements in his report. On the receipt of this report, the consignees declined receiving any more of the salt, and stopped the sale of that which had been delivered. A few days afterwards, the agents of the ship called upon Charles F. Chandler, professor of chemistry in Columbia College and president of the board of health, to make an examination of the ship and the cargo on board. He carefully inspected the vessel and took samples, which were analyzed for him by the chemist of the board of health. He also selected one of the sacks for examination, and parts of its contents were analyzed. Arsenic was found in the salt, but he was of the opinion that there was not danger of harm coming from the use of the salt, and, therefore, as a member of the board of health, did not condemn it. When these examinations were made, nearly all of the salt had been removed from the orlop deck and the between decks, and many of the tiers in the lower hold had been broken up, in selecting out the different brands to fill the various delivery orders, and there was no way of determining the actual condition of the sacks which had been discharged, except by chemical analysis, the expense of which would be more than the

salt would be worth afterwards. Soon after the last report of the examiners was made, the remainder of the salt was discharged and placed in store, under an amicable arrangement, for that purpose, between the parties. All that which had been before delivered was collected and placed in the same store. It remained there for something more than a year, when, under another arrangement between the parties, it was sold for fertilizing purposes. The loss on the Ashton salt, by this sale, it was agreed between the parties, amounted, at the date of the decree below, January 3d, 1878, to five thousand three hundred and eight $^{08}/_{100}$ dollars. After the salt had been placed in store, under the arrangement between the parties, the libellant refused to permit the respondents to put it on the market for sale, to go into consumption."

John E. Parsons, for libellant.
Henry Nicoll, for claimants.

WAITE, Circuit Justice. It was conceded, upon the argument in this court, that the arsenic was badly stowed, and that the ship was liable to the extent it could be shown the salt had been actually impregnated with the poison. The whole controversy here has been in respect to the amount of damages. On the part of the ship, it is claimed that the sacks which had come in contact with the arsenic should have been separated from those that had not, and that the good should have been sold as sound, the others only being condemned. Undoubtedly, a very large part of the cargo was free from taint when it arrived. If a careful inspection had then been made, and pains taken to keep such of the sacks as had been exposed to contamination from such as had not, it is clear that a separation might have been made of the good from the bad, which would have ensured safety. But, unfortunately, this was not done. Whether designedly or not, the consignees were kept in ignorance of what had occurred on the voyage, and an inspection of the ship delayed by her officers and agents, until bulk had been broken, and a large number of the impregnated sacks mixed with others, that were probably sound, in such a way that it was impossible to distinguish the one from the other. Confessedly, all the sacks of the Marshall brand which came out of the main hatch on the 17th, and all the sacks of the Ashton brand which came out on the 19th, were taken from around the main-mast and from the other places that had been most exposed to the poison. No attempt whatever was made on the 17th to confine the arsenic to the places in which it then was. In fact, no attention at all was paid to it until complaint came from the lighterman. Even then notice could not have been given that the powder which was the cause of the complaint was arsenic, for, the delivery clerk, who was sent by the consignees of the ship to check out the cargo, was not made acquainted with the facts until Monday, when the consignees of the salt came to stop further deliveries. It was then clearly too late to make an absolutely reliable separation. The evidence shows, beyond all question, that the poison had become mixed with the salt in some of the sacks, in quantities sufficient to endanger life, and that, after the dust had been knocked or brushed off the outside of the sack, as it easily could be, there was no way of telling what had become impregnated and what had not, except by an expensive chemical analysis. When, therefore, the consignees of the salt became aware of the dangers to which it had been exposed and stopped further deliveries, the commercial character of their property, as a superior article of fine salt for the table and other domestic uses, was necessarily gone. The consignees of the arsenic had told the consignees of the salt that there was arsenic enough scattered about the ship, during the voyage, "to poison a nation," and from two to three hundred sacks, that were known to have been exposed to contact with the poison, had been mingled indiscriminately with fifteen hundred, or thereabouts, which might have been sound, without any way of distinguishing the good from the bad. The tiers, as they had been piled in the ship, were broken up, and the poisonous dust, which, in some places, stood half an inch thick upon the outside of the sacks, had been suffered to fall where it would, without any attempt whatever at confinement. Clearly, under such circumstances, there was no way of ensuring absolute safety, except to condemn the whole. It matters not that persons might have been found, who, tempted by the hope of gain, would pay for the property more than it was worth for fertilizing purposes, and run the risk of selling it for domestic uses. To have exposed a single sack to sale for such uses would be a gross wrong, unless it was known to be entirely free from danger. The public safety required that no risks should be taken. A mistake could not be tolerated, and, as the ship alone was at fault for putting the property in such a condition that absolute certainty in this particular was not attainable, it is but just that she should be charged with the difference between its value, according to the commercial character to which it had been reduced by her gross and palpable neglect, and that which it originally had. Human life is not to be needlessly exposed to danger.

But, it is useless to proceed further. This whole subject was carefully considered by the learned district judge, and I agree fully with the views expressed in his elaborate opinion filed below. Let a decree be prepared in favor of the libellant, for the amount of the decree below, with interest on the actual amount of the loss, from the date of that decree until the present time, and also for the costs in both courts.